# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JESSICA ANN CALDEIRA,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>　　　　Defendant. | Case No. 1:16-cv-01833-SAB<br><br>ORDER DENYING PLAINTIFF'S SOCIAL SECURITY APPEAL<br><br>(ECF Nos. 14, 19, 20) |

## I.

## INTRODUCTION

Plaintiff Jessica Ann Caldeira ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying her application for disability benefits pursuant to the Social Security Act. The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to Magistrate Judge Stanley A. Boone.[1]

Plaintiff suffers from hypertension, a history of polysubstance abuse, multiple sclerosis ("MS"), osseous spur on right calcaneus, left knee contusion, obesity, affective disorder, bipolar disorder, organic mental disorder, personality disorder, and borderline intellectual functioning. For the reasons set forth below, Plaintiff's Social Security appeal shall be denied.

---

[1] The parties have consented to the jurisdiction of the United States Magistrate Judge. (See ECF Nos. 8, 9.)

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff previously filed for a period of disability on January 25, 2006. (AR 152.) She appeared for a hearing on November 30, 2007. (AR 126-148.) Plaintiff's application for benefits was denied initially on July 21, 2008, and denied upon reconsideration on November 24, 2009. (AR 149-160, 161-163.)

Plaintiff filed a second application for a period of disability and appeared for hearings on January 12, 2011, and May 5, 2011. (AR 83-103, 104-126.) Plaintiff's application was denied on October 28, 2011. (AR 19.) Plaintiff's application was denied on voluntary remand on October 28, 2011. (AR 171-186.)

Plaintiff protectively filed the instant Title XVI application for supplemental security income on September 25, 2012. (AR 299-304.) Plaintiff's application was initially denied on May 7, 2013, and denied upon reconsideration on March 6, 2014. (AR 232-235, 239-244.) Plaintiff requested and received a hearing before Administrative Law Judge G. Ross Wheatley ("the ALJ"). Plaintiff appeared for a hearing on April 23, 2015. (AR 42-82.) On June 12, 2015, the ALJ found that Plaintiff was not disabled. (AR 16-32.) The Appeals Council denied Plaintiff's request for review on October 7, 2016. (AR 1-3.)

### A.    Hearing Testimony

Plaintiff appeared with counsel and testified at a hearing on April 23, 2015. (AR 47-72.) Plaintiff was born on October 10, 1978, and was thirty-six years old on the date of the hearing. (AR 47.) Plaintiff is 5 foot 3 inches tall and weighs approximately 300 pounds. (AR 47.) Plaintiff graduated from high school. (AR 47-48.) Plaintiff was unable to make it in a regular classroom and took special education classes. (AR 48.)

Plaintiff lives with her father, brother, sister-in-law, and their two children who are four and five. (AR 60.) The kids are pretty active. (AR 59.) Plaintiff used to have a driver's license but never renewed it because her eyes got worse and she could not drive. (AR 64.) Her aunt drove her to the hearing. (AR 64.) Plaintiff has taken the bus a few times. (AR 64.) She went to Modesto which takes about an hour. (AR 64.) It has been a while since she did that because

she usually has people drive her where she needs to go.  (AR 64-65.)  She usually has people take her to the doctor but she has taken the bus there before.  (AR 65.)

Sometimes Plaintiff needs help bathing or getting dressed.  (AR 59.)  Plaintiff father or brother will help her get into the bathtub to shower all the time because it is kind of high.  (AR 59-60.)  The bathtub does not have safety bars.  (AR 59.)  Plaintiff does not cook or help prepare food.  (AR 60.)  She tries to boil water or make herself breakfast but burns herself a lot.  (AR 60.)  She has not tried in a while.  (AR 60.)  Plaintiff is able to use the microwave and make herself a sandwich.  (AR 60.)  Plaintiff picks up after herself.  (AR 61.)  Plaintiff does not help with the dishes because she breaks things when she drops them.  (AR 61.)  Plaintiff will sweep and vacuum but she falls a lot.  (AR 61.)  Her brother or dad take out the trash.  (AR 61.)  Plaintiff used to do laundry but does not do much anymore.  (AR 62.)  She stopped doing laundry because she would put the wrong amount of laundry soap in or would spill it due to her shaking.  (AR 62.)

Plaintiff reads love stories, but does not remember what she reads.  (AR 62.)  Plaintiff has used a computer to read but has not done so in a while.  (AR 62.)  Plaintiff has an e-mail account and a Facebook account but has not gone on it in a while.  (AR 62-63.)  Plaintiff has a cellphone and texts.  (AR 63.)  Plaintiff watches television at night.  (AR 63.)  She will watch Lifetime.  (AR 63.)  People have to explain to her what is happening in the movies because she has a hard time focusing and keeping on task.  (AR 72.)

Plaintiff worked as a cashier and stocker.  (AR 48.)  Plaintiff worked at Walmart as a stocker from 1997 through 2002.  (AR 49.)  She also worked as a stocker and cashier, half time in each position.  (AR 49.)  Plaintiff worked until 2005 and stopped working because her doctor told her to go on disability because she has MS and is bipolar.  (AR 50-51.)

Plaintiff is able to read and write but her eyes are all messed up and she is not always able to see the words.  (AR 50.)  Plaintiff is able to do basic math skills but not all math skills.  (AR 50.)  Plaintiff is not always able to figure out if she gets the correct change back when she is shopping.  (AR 50.)

Plaintiff has the most problems due to her MS and bipolar disorder.  (AR 51.)  Plaintiff is

seeing Dr. Edwards for her bipolar disorder every three months and saw him the day prior to the hearing. (AR 51-52, 54.) Dr. Edwards started her on a new medication because the other medication was not working. (AR 52.) None of the medications do very good; Plaintiff gets easily upset and will yell, scream, and throw things. (AR 52.) The doctor has told her that she needs to try her hardest to control it, but it is hard because little things make Plaintiff mad and it just comes out. (AR 53.) Sometimes her medications help, but not always. (AR 53.) Her doctor has provided her with coping strategies and she has tried them but they do not always work. (AR 53.) Plaintiff also sees a counselor every five weeks. (AR 54.) She talks to the counselor about stuff that goes on. (AR 54.) It helps a little bit to talk to the counselor. (AR 54.) The counselor calms Plaintiff down, but when she gets home it starts up again. (AR 54.) Her bipolar is worse at home because her sister-in-law is also bipolar. (AR 72.)

Plaintiff has fatigue and shaking in her hands from her MS. (AR 70.) She loses her balance and falls a lot. (AR 71.) She has been falling a lot lately. (AR 71.) She went to the emergency room because she fell and cracked her head open about six months ago. (AR 72.)

Plaintiff has anxiety attacks and cannot be around a lot of people. (AR 65.) Plaintiff only gets panic attacks when she is around a lot of people. (AR 71.) Plaintiff takes medication for them. (AR 65.) Plaintiff gets together with family socially, but if there are too many people around she will hide somewhere. (AR 66.) There are too many people when you go to the grocery store or if they are having a party. (AR 66.) Plaintiff used to go to the grocery store, but that was a while ago. (AR 66.) Her panic attacks have gotten worse. (AR 66.) She just told the doctor about it yesterday so they changed her medication. (AR 66.) Plaintiff used to get together with friends or family to go coffee or lunch, but has not done that in a while. (AR 66-67.) Plaintiff went to church when she was younger but has not gone recently. (AR 67.)

Plaintiff takes medication for her high blood pressure that helps most of the time. (AR 55.) Plaintiff is trying to lose weight and has lost a little. (AR 55.) Plaintiff tries to exercise on the treadmill, but she broke her femur bone and that bothers her sometimes. (AR 55.) Plaintiff does walk but not five times a week because her legs start bothering her. (AR 55.) Plaintiff will walk around the block a couple days a week. (AR 56.) Plaintiff hurt her knee dribbling a

basketball. (AR 56.) She was not playing basketball but tried to dribble the ball and was unable to do so because of her knee. (AR 56.) She was playing and trying to run and could not run because of her knee. (AR 56.)

Plaintiff broke her femur bone and went through therapy. (AR 57.) It did not help because her knee still bothers her. (AR 57.) Plaintiff has home exercises that she does. (AR 57.) She tries to follow the program but does not always. (AR 57.) Plaintiff was told to do the exercises as much as she can and she does them three days a week. (AR 57.) Plaintiff has a stretching plan where she is to lie on the ground and move around to stretch her knee and back. (AR 57.) She tries to do the program but cannot lie on the floor because she hurt her tailbone. (AR 57.) Somebody hit her in the tailbone a long time ago. (AR 58.)

Plaintiff gets shots for her MS. (AR 58.) She gives herself the shots or someone else will give her the shots. (AR 58.) The shots do not help; she still has fatigue and shaking. (AR 58.) The doctor tried to give her something to calm the shaking but she still has shaking. (AR 58-59.) Sometimes Plaintiff forgets to take her medications because she has a memory problem. (AR 59.) Her family will remind her that she needs to take them. (AR 59.) Plaintiff has difficulty with her memory because of her eyes. (AR 72.)

Plaintiff is able to walk around the block. (AR 67.) She is very weak and can only lift five or ten pounds. (AR 67.) Plaintiff can pick up a gallon of milk. (AR 68.) She has tried to pick up her niece or nephew. (AR 68.) Her nephew is too heavy for her. (AR 68.) He weighs about thirty pounds. (AR 68.) She used to be able to pick him up when he was two, but now he is four. (AR 68.)

Plaintiff used to smoke but she stopped three or four years ago. (AR 68.) Plaintiff used to drink but stopped. (AR 69.) She is not supposed to drink because of her MS. (AR 69.) Plaintiff used crank in the past. (AR 69.) It has been eight years since she used. (AR 69.) Plaintiff does not do meth or amphetamines. (AR 69-70.) Plaintiff's doctor has not had her take a drug test. (AR 70.)

A vocational expert ("VE"), Lorian I. Hyatt, also testified at the hearing. (AR 73-80.) The VE classified Plaintiff's past work as a retail cashier, Dictionary of Occupational Titles

("DOT") 290.477-014, light with a specific vocational preparation ("SVP") of 3; and stocker, DOT 299.367-014, heavy with an SVE of 4. (AR 74.)

The ALJ proffered a hypothetical of an individual of Plaintiff's age, education and work experience who is capable of performing work at the light level, defined as standing or walking for approximately four hours in an eight-hour day; sitting up to six hours in an eight-hour day with normal breaks; no ladders, ropes or scaffolds; occasional ramps/stairs, balancing, stooping, crouching, kneeling, and crawling. (AR 75.) The individual should avoid concentrated exposure to extreme heat and moderate exposure to hazardous machinery and unprotected heights. (AR 75.) Work is limited to simple as defined in the DOT as SVP levels 1 and 2, routine and repetitive tasks involving only occasional changes in the work setting, and occasional interaction with the general public, coworkers, and supervisors. (AR 74-75.) The VE opined that this individual would not be able to perform Plaintiff's past work due to the restriction to light and simple work. (AR 76.)

The individual would be able to work as an office helper, DOT 239.567-010, light with an SVP of 2. (AR 76.) Eroding the overall labor market by 25 percent for the limitation regarding public contact would leave 75,000 jobs nationwide and 7,500 jobs in the state of California. (AR 76, 77.) The individual would also be able to work as a mail sorter, DOT 209.687-026, light with SVP of 2, with approximately 115,000 jobs in the nation and 10,000 in California. (AR 76.) There would be no significant erosion for this job. (AR 76-77.) The individual would also be able to work as an inspector, DOT 559.687-074, light with SVP of 2, with 230,000 jobs nationally and 48,000 in California. (AR 77.)

The ALJ proffered a second hypothetical of the same individual with the same limitations but who would also require a sit/stand option allowing them to sit or stand at will provided that they are not off task more than ten percent of the period. (AR 77-78.) The office helper position would be errored an additional 25 percent, the mail sorter would be eroded by 50 percent; and the inspector would be eroded by 50 percent to accommodate the sit/stand option. (AR 78.)

The ALJ added with respect to both of the above hypotheticals the limitation that the individual would need close supervision as defined by having a supervisor check on them four

times throughout the day.  (AR 78.)  The VE opined that would not change the jobs available.  (AR 78.)

The ALJ proffered a third hypothetical of an individual who had the additional limitation that due to a combination of medical conditions, and associated pain and mental impairments would be likely to have three to four unexcused or unscheduled absences per month.  (AR 79.)  The VE opined that there would be no jobs for this individual.  (AR 79.)

The ALJ added the additional limitation to the first and second hypothetical that due to a combination of conditions and associated pain and mental impairments the individual would be unable to sustain work activity on a regular and continuing basis for eight hours a day five days a week for a 40-hour workweek or an equivalent schedule.  (AR 79.)  The VE opined that there would be no work available for this individual.  (AR 79.)  The VE opined that her testimony was consistent with the DOT and her labor market experience which was utilized for the erosion factor.  (AR 79.)

Plaintiff's counsel proffered a hypothetical of the second hypothetical with the additional limitation of occasional fingering and fine manipulation.  (AR 80.)  The VE opined that there would be no work for this individual.  (AR 80.)  The VE stated that if you added this information into the DOT sorting instrument, it would come up with jobs the individual could perform, but that she disagreed that any jobs would be available.  (AR 80.)

Plaintiff's counsel asked if any work would be available at the sedentary level.  (AR 80.)  The VE opined that there would be no jobs available.  (AR 80.)

**B.     ALJ Findings**

The ALJ made the following findings of fact and conclusions of law.

- Plaintiff has not engaged in substantial gainful activity since the application date of September 25, 2012.

- Plaintiff has the following severe impairments:  multiple sclerosis, osseous spur on right calcaneus, left knee contusion, obesity, affective disorder, bipolar disorder, organic mental disorder, personality disorder, and borderline intellectual functioning.

- Plaintiff does not have an impairment or combination of impairments that meets or

medical equals the severity of one of the listed impairments.

- Plaintiff has the residual functional capacity to perform light work as defined in the regulations with the following limitations: Plaintiff is able stand or walk for four hours, and sit for six hours during a normal eight-hour workday. She can never climb ladders, ropes, or scaffolds; can occasionally climb ramps and stairs, balance, stoop, crouch, kneel, and crawl. Plaintiff must avoid concentrated exposure to extreme cold and heat and even moderate expose to hazardous machinery and unprotected heights. Plaintiff is limited to simple work, defined in the DOT as SVP, routing and repetitive tasks. Plaintiff is limited to occasional changes in the work setting and occasional interaction with the public, coworkers, and supervisors. Plaintiff requires close supervision while working, defined as checking on the individual four times throughout the workday.

- Plaintiff is unable to perform any past relevant work.

- Plaintiff was born on October 10, 1978, and was 33 years old, which is defined as a younger aged individual age 18-49, on the date the application was filed.

- Plaintiff has at least a high school education and is able to communicate in English.

- Transferability of job skill is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that Plaintiff is "not disabled" whether or not Plaintiff has transferable job skills.

- Considering Plaintiff's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform.

- Plaintiff has not been under a disability, as defined in the Social Security Act, since the date the application was filed, September 25, 2012.

(AR 21-31.)

### III.

### LEGAL STANDARD

To qualify for disability insurance benefits under the Social Security Act, the claimant must show that she is unable "to engage in any substantial gainful activity by reason of any

medically determinable physical or mental impairment which can be expected to result in death

or which has lasted or can be expected to last for a continuous period of not less than 12

months." 42 U.S.C. § 423(d)(1)(A). The Social Security Regulations set out a five step

sequential evaluation process to be used in determining if a claimant is disabled. 20 C.F.R. §

404.1520; Batson v. Commissioner of Social Security Administration, 359 F.3d 1190, 1194 (9th

Cir. 2004). The five steps in the sequential evaluation in assessing whether the claimant is

disabled are:

> Step one: Is the claimant presently engaged in substantial gainful activity? If so, the claimant is not disabled. If not, proceed to step two.
>
> Step two: Is the claimant's alleged impairment sufficiently severe to limit his or her ability to work? If so, proceed to step three. If not, the claimant is not disabled.
>
> Step three: Does the claimant's impairment, or combination of impairments, meet or equal an impairment listed in 20 C.F.R., pt. 404, subpt. P, app. 1? If so, the claimant is disabled. If not, proceed to step four.
>
> Step four: Does the claimant possess the residual functional capacity ("RFC") to perform his or her past relevant work? If so, the claimant is not disabled. If not, proceed to step five.
>
> Step five: Does the claimant's RFC, when considered with the claimant's age, education, and work experience, allow him or her to adjust to other work that exists in significant numbers in the national economy? If so, the claimant is not disabled. If not, the claimant is disabled.

Stout v. Commissioner, Social Sec. Admin., 454 F.3d 1050, 1052 (9th Cir. 2006).

Congress has provided that an individual may obtain judicial review of any final decision

of the Commissioner of Social Security regarding entitlement to benefits. 42 U.S.C. § 405(g).

In reviewing findings of fact in respect to the denial of benefits, this court "reviews the

Commissioner's final decision for substantial evidence, and the Commissioner's decision will be

disturbed only if it is not supported by substantial evidence or is based on legal error." Hill v.

Astrue, 698 F.3d 1153, 1158 (9th Cir. 2012). "Substantial evidence" means more than a

scintilla, but less than a preponderance. Smolen v. Chater, 80 F.3d 1273, 1279 (9th Cir. 1996)

(internal quotations and citations omitted). "Substantial evidence is relevant evidence which,

considering the record as a whole, a reasonable person might accept as adequate to support a

conclusion." Thomas v. Barnhart, 278 F.3d 947, 955 (9th Cir. 2002) (quoting Flaten v. Sec'y of

Health & Human Servs., 44 F.3d 1453, 1457 (9th Cir. 1995)).

"[A] reviewing court must consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence." Hill, 698 F.3d at 1159 (quoting Robbins v. Social Security Administration, 466 F.3d 880, 882 (9th Cir. 2006). However, it is not this Court's function to second guess the ALJ's conclusions and substitute the court's judgment for the ALJ's. See Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005) ("Where evidence is susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld.").

## IV.

## DISCUSSION AND ANALYSIS

Plaintiff alleges that the ALJ erred in finding that she was not credible and at step five because all of her limitations were not included in the hypothetical presented to the VE. Defendant counters that the ALJ properly evaluated Plaintiff's testimony and provided multiple reasons for the credibility finding that are supported in the record. Defendant also contends that the step five determination was proper and Plaintiff is confusing the step two criteria and step three findings with the RFC assessment. Plaintiff counters that Defendant's arguments do not have merit and remand is appropriate.

### A.    The ALJ Provided Clear and Convincing Reasons for the Adverse Credibility Finding

Plaintiff argues that the ALJ erred in finding that her activities of daily living contradicted her claimed limitations, her symptoms were controlled by medication, and that her treatment was conservative. Plaintiff contends that the ALJ misconstrues the evidence and his opinion suggests that he misunderstands the very nature of mental impairments. Defendant counters that the ALJ noted that Plaintiff's claimed limitations were inconsistent with her daily activities, her symptoms were improved and controlled by medication, and she only received conservative treatment which are proper bases to discredit Plaintiff. Plaintiff responds that her stated activities are not inconsistent with her claimed limitations.

"An ALJ is not required to believe every allegation of disabling pain or other non-

exertional impairment." Orn v. Astrue, 495 F.3d 625, 635 (9th Cir. 2007) (internal punctuation and citations omitted). Determining whether a claimant's testimony regarding subjective pain or symptoms is credible, requires the ALJ to engage in a two-step analysis. Molina v. Astrue, 674 F.3d 1104, 1112 (9th Cir. 2012). The ALJ must first determine if "the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged." Lingenfelter v. Astrue, 504 F.3d 1028, 1036 (9th Cir. 2007) (internal punctuation and citations omitted). This does not require the claimant to show that her impairment could be expected to cause the severity of the symptoms that are alleged, but only that it reasonably could have caused some degree of symptoms. Smolen, 80 F.3d at 1282.

Then "the ALJ may reject the claimant's testimony about the severity of those symptoms only by providing specific, clear, and convincing reasons for doing so." Brown-Hunter v. Colvin, 806 F.3d 487, 488–89 (9th Cir. 2015). "The ALJ must specifically make findings that support this conclusion and the findings must be sufficiently specific to allow a reviewing court to conclude the ALJ rejected the claimant's testimony on permissible grounds and did not arbitrarily discredit the claimant's testimony." Moisa v. Barnhart, 367 F.3d 882, 885 (9th Cir. 2004) (internal punctuation and citations omitted). Factors that may be considered in assessing a claimant's subjective pain and symptom testimony include the claimant's daily activities; the location, duration, intensity and frequency of the pain or symptoms; factors that cause or aggravate the symptoms; the type, dosage, effectiveness or side effects of any medication; other measures or treatment used for relief; functional restrictions; and other relevant factors. Lingenfelter, at 1040; Thomas, 278 F.3d at 958. In assessing the claimant's credibility, the ALJ may also consider "(1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; [and] (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment. . . ." Tommasetti v. Astrue, 533 F.3d 1035, 1039 (9th Cir. 2008) (quoting Smolen, 80 F.3d at 1284). The district court is constrained to review those reasons that the ALJ provided in finding the claimant's

testimony not credible.  Brown-Hunter, 806 F.3d at 492.

Here, the ALJ found that Plaintiff's medically determinable impairments could be reasonably expected to cause the alleged symptoms but Plaintiff's statements regarding the intensity, persistence and limiting effects of the symptoms were not entirely credible for the reasons discussed in the opinion.  (AR 25.)

### 1.  Activities of Daily Living

The ALJ noted that Plaintiff reported difficulties with activities of daily living, but found that she was able to attend to basic activities of daily living.  (AR 24-25.)  The ALJ found that Plaintiff alleged difficulties with memory and concentration, but acknowledged that she watches television and movies during the day with no alleged difficulty in following the story line.  (AR 25, 63.)  However, Plaintiff did testify that she has to have people explain to her what is happening in the movies because she has a hard time focusing and keeping on task.  (AR 72.)

The ALJ also noted that Plaintiff testified that her MS causes her to lose balance and she falls frequently.  (AR 24, 61, 71.)  Plaintiff reported on February 4, 2013, that she used a cane to help with walking.  (AR 24, 358.)  In a June 14, 2013, Disability Report appeal, Plaintiff stated that her condition had worsened and she needed a cane for walking and was falling a lot.  (AR 25, 365.)  On April 1, 2014, Plaintiff reported that her condition had worsened and she was having greater difficulty walking.  (AR 25, 376, 379.)  The ALJ found that Plaintiff alleges that she has difficulty walking and needed a cane, however, she walked without a cane at the hearing and no difficulty walking was observed.  (AR 25.)

The ALJ also noted that a January 8, 2014 treatment record noted that Plaintiff injured her knee when using a step stool.  (AR 27, 532.)  In February 2014, Plaintiff reported that she had been having knee pain starting around the Christmas holiday when she twisted her knee while using a step ladder.[2]  (AR 27, 616.)  At a follow up appointment on February 25, 2014, Plaintiff reported that her pain was improving but she had injured her knee again when she was

---

[2] The Court notes the actual date of this visit was March 20, 2014.  Plaintiff went to the emergency room on December 14, 2013, and stated that she had injured her knee when she was climbing a step ladder three weeks earlier.  (AR 515.)

playing basketball three days earlier and felt her knee pop. (AR 27, 538.) At the April 23, 2015

hearing, Plaintiff testified that she only played basketball one time. (AR 56.) While Plaintiff

stated that she was not playing basketball but tried to dribble the ball and was unable to do so

because of her knee, she also testified that she was playing and trying to run and could not run

because of her knee. (AR 56.)

The ALJ found that the medical record indicated that Plaintiff was much more agile and

able to move about than alleged. (AR 27.) She was able to play basketball and climb a ladder.

(AR 27.) Daily activities can form the basis of an adverse credibility determination if the

claimant's activity contradicts her testimony. Orn, 495 F.3d at 639.

Plaintiff is correct in arguing that "[t]he mere fact that a plaintiff has carried on certain

daily activities . . . does not in any way detract from her credibility as to her overall disability."

Orn, 495 F.3d 625, 639 (9th Cir. 2007) (citing Vertigan v. Halter, 260 F.3d 1044, 1050 (9th Cir.

2001)). However, in this instance, the ALJ pointed to specific testimony by Plaintiff, specifically

that she had difficulty walking, loses her balance frequently, and needs a cane; which was

inconsistent with her activities recorded in the record, playing basketball and climbing a step

ladder. Substantial evidence supports the ALJ's findings that Plaintiff's activities demonstrate

that she is much more agile and able to move about than she alleges. This is a clear and

convincing reason to support the adverse credibility finding.

2. Objective Medical Evidence and Improvement with Conservative Treatment

The determination that a claimant's complaints are inconsistent with clinical evaluations

can satisfy the requirement of stating a clear and convincing reason for discrediting the

claimant's testimony. Regennitter v. Commissioner of Social Sec. Admin., 166 F.3d 1294, 1297

9th Cir. 1999). The ALJ properly considered this evidence in weighing Plaintiff's credibility.

"While subjective pain testimony cannot be rejected on the sole ground that it is not fully

corroborated by objective medical evidence, the medical evidence is still a relevant factor in

determining the severity of the claimant's pain and its disabling effects." Rollins v. Massanari,

261 F.3d 853, 857 (9th Cir. 2001) (citing 20 C.F.R. § 404.1529(c)(2)). Further, evidence of

conservative treatment is sufficient to discount a claimant's testimony regarding the severity of

the impairment, <u>Parra v. Astrue</u>, 481 F.3d 742, 751 (9th Cir. 2007), and a condition that can be effectively controlled with medication is not disabling for the purposes of determining eligibility for Social Security Insurance benefits, <u>Warre v. Commissioner of Social Sec. Admin.</u>, 439 F.3d 1001, 1006 (9th Cir. 2006).

### a. Multiple Sclerosis

The ALJ found that the medical record demonstrates that Plaintiff's MS symptoms are mild and controlled with medication. (AR 25.) He found that it is reasonable that deconditioning and weight contribute to Plaintiff's alleged balance problems as opposed to her stable MS. (AR 25.) Plaintiff received conservative treatment for her MS and there does not appear to be a significant change from her prior application. (AR 26.)

Prior to the current application, the medical record shows that Plaintiff's MS symptoms were stable when she was on her medication with an occasional mild flare. (AR 394, 395, 417, 419, 424.)

On June 23, 2013, Dr. Porecha noted that Plaintiff was complaining of numbness in the fingers of both hands and difficulty keeping her balance when walking. (AR 632.) Dr. Porecha stated she was started on Copaxone in 2011 with no improvement of her symptoms although there have been no exacerbations documented. (AR 632.) Plaintiff had diminished deep tendon reflexes in all extremities but her coordination was normal. (AR 633.) She had "no sensory loss to light touch or pin prick stimuli, the metome levels and loss of specific sensation such as temperature and sensation and vibration sensations. (AR 633.) Dr. Porecha recommended that Plaintiff be continued on her Copaxone. (AR 633.)

Plaintiff was next seen for follow up on her MS on October 9, 2013, complaining that she was feeling tired a lot and her legs start hurting and she has a hard time sleeping at night due to spinal pain. (AR 625.) Plaintiff talked about a pill that she wanted to go on. (AR 625.) She stated that she has been falling a lot and her balance is on and off. (AR 625.) Dr. Porecha noted that Plaintiff had a lumbar puncture because she was complaining of left side numbness and double vision which resolved after 2 to 4 months. (AR 625.) In 2003, Plaintiff had been diagnosed with MS and was going through a mild exacerbation and physical examination was

remarkably benign.  (AR 626.)  On this date, Plaintiff's deep tendon reflexes were 1 to 2+ at the knees and ankles.  (AR 627.)  Her neurological examination was unremarkable.  (AR 627.)  Dr. Porecha noted that Plaintiff wanted to try Gilenya for her MS which would require a lot of evaluation for the cardiac rhythm disturbances or any macular edema type changes if she wanted to continue with that possibility.  (AR 627.)

Plaintiff saw Dr. Porecha again on February 26, 2014, and he noted that Plaintiff wanted to continue with the Copaxone.  (AR 620.)  She complained that she was tired a lot; she kept losing her balance; and the shots were very painful.  (AR 620.)  Plaintiff also complained of left sided numbness and diplopia which resolved after 2 to 4 months.  (AR 620.)  Dr. Porecha noted that he did not see any evidence of CSF report in the patient's chart.  (AR 620.)  He did not know if she had a lumbar puncture.  (AR 620.)

On June 11, 2014, Plaintiff saw Dr. Porecha and stated that she would like to change to an oral medication.  (AR 608.)  Dr. Porecha recommended that she be changed over to oral medications.  (AR 608.)  He stated that there was a possibility of fractures if her symptoms continue.  (AR 608.)

Plaintiff argues that the medical record shows that Dr. Porecha noted that Copaxone did not improve Plaintiff's symptoms, she had diminished reflexes, and complained of numbness in her fingers and difficulty keeping her balance.  Plaintiff also argues that Dr. Porecha discussed changing her medication and if her symptoms were controlled by medication he would not have done so.

However, review of the record supports the ALJ's finding that Plaintiff's symptoms were stable and controlled with her treatment.  While Plaintiff argues that Dr. Porecha would not have recommended that her medication be changed if it was controlling her symptoms, review of the record indicates that the change from injections of Copaxone to an oral medication was due to Plaintiff's request (AR 608, 625, 627), and not to Dr. Porecha's finding that the Copaxone was not controlling her symptoms.

Plaintiff contends that Dr. Porecha also noted that he would discuss with Plaintiff the various oral medications that are available for the treatment of relapsing intermittent MS,

however, Dr. Porecha's treatment notes do not indicate that Plaintiff was having an exacerbation of her symptoms. Substantial evidence in the record supports the ALJ's finding that Plaintiff's MS was controlled and stable on her medication.

**b.** <u>**Vision Problems**</u>

The ALJ also considered that Plaintiff alleged vision problems, but the record demonstrates that she had double vision which resolved in two to four months and there is little evidence of recurring visual problems due to MS. (AR 25-26, 632.) Plaintiff was prescribed glasses that seem to correct any visual problems. (AR 26, 358, 482.)

At the hearing, Plaintiff testified that she gave up her driver's license because her eyes got worse and she was unable to drive. (AR 64.) Plaintiff stated she is able to read but her eyes are all messed up and she is not always able to see the words. (AR 50.) Plaintiff also testified that she had difficulty with her memory due to her eyes. (AR 72.)

On June 26, 2013, Dr. Porecha noted that neurological examination shows normal visual fields by confrontation testing, funduscopic examination shows pale disk but with sharp disc margins on both sides, extraocular movements are normal. (AR 632.)

On October 9, 2013, Dr. Porecha noted that Dr. Schaffert's examination showed unremarkable funduscopic examination, normal visions fields, pupils were equal and reactive, and extraocular movements were normal. (AR 626.) Neurological examination on this date showed that Plaintiff's pupils were 2.0 to 3.0 millimeters, equal and reactive to light with normal eye movement. (AR 627.)

Substantial evidence in the record supports the ALJ's findings that there is little evidence in the record that Plaintiff had any recurring visual problems due to her MS.

**c.** <u>**Psychological Symptoms**</u>

Plaintiff argues that the ALJ's opinion demonstrates a misunderstanding of mental impairments. Plaintiff contends that it is error to reject her testimony merely because symptoms wax and wane in the course of treatment. Defendant responds that the medical record does not show a waxing and waning of Plaintiff's symptoms but that she received conservative treatment and her symptoms improved when she was compliant with her treatment.

As to Plaintiff's psychological symptoms, the ALJ found that the medical record demonstrated that in January 2014, Plaintiff reported that she was doing well on her current medication regimen.  (AR 28, 537.)  Plaintiff reported in July 2014 that medications were helping and she had improved interpersonal interactions and her symptoms were mild.  (AR 28.)  Plaintiff continued to improve and on August 23, 2014 her symptoms were rated as mild or minimal.  (AR 28.)  Plaintiff consistently was assessed with a Global Assessment Functioning Score ("GAF") of 60.[3]  (AR 28.)  In early 2015, Plaintiff's medications were adjusted but she only had mild symptoms and had improved with medication.  (AR 28.)  Plaintiff reported improved interactions with her family with no outbursts of anger as previously reported.  (AR 28.)

Review of the record demonstrates that Plaintiff was seen for a follow up on her depression and requested she be placed back on her medication on March 1, 2012.  (AR 473.)  On November 7, 2012, her medication was increased.  (AR 445.)  Plaintiff was seen again on December 20, 2012, and her depression is noted to be stable.  (AR 442.)

On April 21, 2013, Plaintiff reported that her psychiatric treatment and medications help her symptoms.  (AR 482.)

On January 21, 2014, Plaintiff reported that she was doing well on her current medication.  (AR 537.)  On March 4, 2014, Plaintiff reported that her symptoms were managed on medication.  (AR 584.)

Plaintiff was seen by Dr. Sidhu on June 19, 2014.  (AR 569-573.)  She reported hearing voices a few years back.  (AR 569.)  She reported she still had mood swings and hears voices.  (AR 569.)  Plaintiff had a generally normal examination except that Dr. Sidhu noted she was exhibiting signs of psychosis, speech was delayed, and her thought content revealed paranoia.

---

[3] "A GAF score is the clinician's judgment of the individual's overall level of functioning.  It is rated with respect only to psychological, social, and occupational functioning, without regard to impairments in functioning due to physical or environmental limitations."  Cornelison v. Astrue, 2011 WL 6001698, at *4 n.6 (C.D. Cal. Nov. 30, 2011) (citing American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders ("DSM–IV"), at 32 (4th ed.2000)).  "A GAF score in the range of 51–60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning ( e.g., few friends, conflicts with peers or coworkers)."  Cornelison, 2011 WL 6001698, at 4 n.6 (citing  American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders ("DSM–IV"), at 34).

1   (AR 572.)  Plaintiff's medications were increased to help control her auditory hallucinations.

2   (AR 571.)

3   Plaintiff saw Dr. Edwards on July 8, 2014, and complained of intermittent auditory

4   hallucinations, difficulty concentrating, and impulsive aggressive outbursts.  (AR 563.)  Plaintiff

5   had moderate improvement on her medication.  (AR 564.)  Dr. Edwards found no signs of

6   psychosis.  (AR 564.)  Plaintiff's mood was labile, anxious, and irritable, and she had poor

7   concentration.  (AR 564-565.)  Otherwise, Plaintiff had a normal examination and was assessed

8   with a GAF of 60.  (AR 565.)  Plaintiff was to begin clonazepam, 1 mg at bedtime and

9   bupropion, 150 mg, each morning.  (AR 564.)

10   Plaintiff was seen on July 22, 2014, by a therapist and was assessed with a GAF of 60.

11   (AR 560.)  On this same date, Plaintiff was seen by her physician for a urinary frequency who

12   noted she was oriented to person, place, and time with no agitation; was not anxious; fund of

13   knowledge and language were sufficient.  (AR 557-558.)  Plaintiff was not in denial, not

14   euphoric, not fearful, had no increased activity, and no mood swings or suicidal ideation.  (AR

15   558.)  Plaintiff had normal insight and judgment.  (AR 558.)  The record also notes that Plaintiff

16   had depressed mood and affect and auditory hallucinations.  (AR 558.)  On August 23, 2014, a

17   depression notification was done which indicated that Plaintiff may have mild or minimal

18   depressive symptoms.  (AR 590.)

19   On October 6, 2014, Plaintiff was seen and reported persistently dysphoric mood,

20   irritability, and midphase wakening.  (AR 552.)  The bupropion was discontinued and Plaintiff's

21   other medications were increased, benztropine, 1 mg, was added twice a day.  (AR 553.)

22   Plaintiff was assessed with a GAF of 60.  (AR 554.)

23   Plaintiff saw a therapist on January 9, 2015.  (AR 549.)  Plaintiff reported butting head

24   with her sister-in-law who also struggles with bipolar.  (AR 550.)  Plaintiff was seen by a

25   therapist on January 21, 2015, and reported that her sleep pattern had improved but command

26   auditory hallucinations persist.  (AR 546.)  Plaintiff was assessed with a GAF of 60.  (AR 548.)

27   On February 6, 2015, Plaintiff reported having mild symptoms and that her medication

28   was helping.  (AR 543.)  She reported improvement in interactions with her family and her

brother noted that Plaintiff had not had any outbursts of anger. (AR 543.) She was assessed with a GAF of 60. (AR 544.)

As the ALJ noted in his opinion, a GAF of 51 to 60 indicates symptoms in the moderate range. (AR 29.) On one occasion signs of psychosis and paranoia were noted (AR 572), but there are no further such findings after Plaintiff's medication was increased. Other than irritability and concentration issues, the record demonstrates generally normal examination findings since the date the current application was filed. (AR 442, 445, 483-485, 546, 554, 557-558, 564-565, 572.)

Plaintiff argues that the fact that Plaintiff's medications were changed indicates that her symptoms were not well controlled on the medication, and offers a different interpretation of the evidence. However, it is not this Court's function to second guess the ALJ's conclusions and substitute the court's judgment for the ALJ's. Burch, 400 F.3d at 679. Substantial evidence supports the ALJ's findings that Plaintiff reported doing well on her medication and she improved with medication. This is a clear and convincing reason to support the credibility finding.

3. Conclusion

The ALJ provided clear and convincing reasons which are supported by substantial evidence in the record to find that Plaintiff's symptom complaints were not credible.

**B. Step Five**

Plaintiff also alleges that the ALJ erred because the hypothetical provided to the VE did not contain all of her limitations. Specifically, Plaintiff argues that the ALJ accepted that Plaintiff had moderate limitations in concentration, persistence, and pace and the limitation to simple, repetitive work does not account for those limitations.

Defendant counters that Plaintiff is confusing the Paragraph B criteria at steps 2 and 3 with the RFC. Here, the ALJ considered Plaintiff's mental impairments at step 2 to determine whether she had established a severe impairment but the criteria findings are not Plaintiff's RFC. The ALJ examined the medical record and found that Plaintiff had the RFC to perform simple and routine tasks with SVP 1 or 2 levels and Plaintiff has not demonstrated how this fails to

account for her difficulties in concentration, persistence, and pace.

Plaintiff replies that Defendant's argument is contrary to established law in this Circuit. Plaintiff argues that the ALJ was required to account for her limitations in concentration, persistence, and pace and failed to do so. Plaintiff cites to Brink v. Comm'r Soc. Sec. Admin., 343 F.App'x 211 (9th Cir. 2009), to argue that in this circuit a limitation to simple repetitive tasks does not encompass moderate limitations in concentration, persistence, and pace.

At step two the ALJ considers if the claimant's alleged impairment is sufficiently severe to limit his or her ability to work. Stout, 454 F.3d at 1052. At step three the ALJ considers if the claimant's impairment, or combination of impairments meet or equal an impairment listed in 20 C.F.R., pt. 404, subpt. P, app. 1. Id.

While Plaintiff argues that the ALJ's finding at step two is inconsistent with the ability to perform simple, repetitive tasks, "[t]he regulations guiding the step-two determination of whether a disability is severe is merely a threshold determination of whether the claimant is able to perform his past work. Thus, a finding that a claimant is severe at step two only raises a prima facie case of a disability." Hoopai v. Astrue, 499 F.3d 1071, 1076 (9th Cir. 2007). At this step, the ALJ has not evaluated the medical evidence to determine the functional capacity the claimant retains with her impairments.

If the claimant has established that she has a severe impairment but has not demonstrated that her impairment or combination of impairments meets or equals a listed impairment, the ALJ goes to step four to determine if the claimant possesses the RFC to perform his or her past relevant work. Stout, 454 F.3d at 1052. A claimant's RFC is "the most [the claimant] can still do despite [his] limitations." 20 C.F.R. § 416.945(a)(1). The RFC is "based on all the relevant evidence in [the] case record." 20 C.F.R. § 416.945(a)(1). "The ALJ must consider a claimant's physical and mental abilities, § 416.920(b) and (c), as well as the total limiting effects caused by medically determinable impairments and the claimant's subjective experiences of pain, § 416.920(e)." Garrison v. Colvin, 759 F.3d 995, 1011 (9th Cir. 2014).

At step four the RFC is used to determine if a claimant can do past relevant work and at step five to determine if a claimant can adjust to other work. Garrison, 759 F.3d at 1011. "In

order for the testimony of a VE to be considered reliable, the hypothetical posed must include 'all of the claimant's functional limitations, both physical and mental' supported by the record." Thomas, 278 F.3d at 956. An ALJ's residual functional capacity "assessment of a claimant adequately captures restrictions related to concentration, persistence, or pace where the assessment is consistent with restrictions identified in the medical testimony." Stubbs-Danielson v. Astrue, 539 F.3d 1169, 1174 (9th Cir. 2008).

The findings that the ALJ made at step 2 and 3 in considering whether Plaintiff had a severe impairment do not establish Plaintiff's functional capacity. The fact that the ALJ found Plaintiff to have moderate limitations with regard to concentration, persistence, and pace in considering whether Plaintiff had a severe mental impairment does not control the hypothetical presented to the VE. Accordingly, the Court considers whether the RFC is supported by the medical record. Here, Plaintiff is only challenging the finding that Plaintiff can perform simple work, defined in the Dictionary of Occupational Titles ("DOT") as specific vocational preparation ("SVP"), routing and repetitive tasks. (ECF No. 14 at 20-23;[4] ECF No. 20 at 4-5; AR 23.) Therefore, the Court shall only consider the opinion as it applies to this finding.

The ALJ found that on May 9, 2011, Plaintiff was diagnosed with bipolar disorder and attention deficit hyperactivity disorder that was found to be stable and doing well with her recent medication changes. (AR 28, 420.) On December 19, 2011 a social worker/therapist added diagnoses of history of poly-substance dependence, borderline personality disorder, and dissociative disorder. (AR 28, 427.) In November 2012, Plaintiff was diagnosed with anxiety disorder. (AR 28, 445.) On December 20, 2012 a diagnosis of alcohol abuse, unspecified drunkenness was added. (AR 28, 444.)

The ALJ found that in July 2014, Plaintiff was assessed with a GAF of 60. (AR 28, 561, 565.) The ALJ noted that Plaintiff reported that her medications were helping her and she was found to have improved interpersonal interaction and her symptoms were rated as mild. (AR 28.) Plaintiff continued to improve as on August 23, 2014, Plaintiff's symptoms were rated as

---

[4] All references to pagination of specific documents pertain to those as indicated on the upper right corners via the CM/ECF electronic court docketing system.

only mild or minimal.  (AR 28, 590.)  In October 2014, Plaintiff again was found to have a GAF of 60.  (AR 28, 554.)

As Plaintiff points out on July 8, 2014, Dr. Edwards found that Plaintiff had poor concentration.  (AR 564.)  But, generally there are no objective findings to show a lack of concentration at Plaintiff's mental health appointments.  On June 19, 2014, Dr. Sidhu notes that Plaintiff's concentration was obtained and maintained.  (AR 570.)  There are no findings to show problems with concentration on other visits during the period at issue here.  (AR 442, 445, 537, 543-44, 546-548, 549-551, 552-553, 561, 584.)

The ALJ also considered that in January and February of 2015, Plaintiff was found to have mild symptoms, improvement with her medication, and improved interactions with her family with no outbursts of anger as previously alleged.  (AR 28, 543, 546.)

In addressing the opinion evidence, the ALJ considered the April 21, 2013 consultative examination by Dr. Gauch.  (AR 29, 481-487.)  Dr. Gauch opined that Plaintiff's ability to understand and remember very short and simple instructions and to maintain concentration and attention was fair.  (AR 29, 487.)  Plaintiff's ability to interact with the public and coworkers, accept instruction from supervisors, sustain ordinary routine without special supervision, and to complete a normal workday and workweek without interruptions at a constant pace was fair, influenced primarily by mood disorder and attention.  (AR 29, 487.)  The ALJ then addressed Dr. Gauch's finding that Plaintiff had a GAF of 50.  (AR 29.)

> Individuals with GAF scores between 41 and 50 typically demonstrate serious symptoms or serious impairment in social or occupational settings.  At a score of 51-60 moderate symptoms or impairment would be expected.  The assessed GAF score may have been valid on the day of the examination, but the treating psychiatric records show consistent GAF scores of 60 [Exhibit C13F].  The undersigned finds that 50 is not an accurate assessment of the claimant's ability to function over an extended period of time, but rather her behaviors and reactions are representative of individuals with moderate symptoms, consistent with GAF scores in the 51-60 range.  At a GAF score of 61, only mild symptoms or limitations would be expected.  "Fair ability" is generally accepted to mean that an individual has limited but satisfactory ability to perform basic work activities.  It generally means that an individual is limited, but not precluded, from the specific work activity.  Translating "fair ability" into functional terms, the undersigned generally accepts the findings of the Consultative Examiner, but refines the specific functional capacity findings, limiting the claimant to simple work with occasional changes and occasional interaction with others.  Further, she requires supervision, defined as checking on four times throughout the workday,

as more fully described in the above residual functional capacity finding.
(AR 29.)

The RFC findings need not be identical to the relevant limitations but must be consistent with them. Turner v. Comm'r of Soc. Sec., 613 F.3d 1217, 1223 (9th Cir. 2010). Here, the ALJ considered Dr. Gauch's findings that Plaintiff's ability to understand and remember very short and simple instructions and to maintain concentration and attention was fair. While Plaintiff argues that the ALJ did not incorporate her moderate limitations of concentration, persistence and pace, neither the ALJ nor Dr. Gauch found that Plaintiff had moderate limitations in concentration, persistence, and pace. In addition to Dr. Gauch's opinion, the ALJ considered that Plaintiff consistently was assessed with a GAF of 60 by her treating providers which is on the cusp of mild to moderate symptoms, and she reported that her symptoms were controlled on medication and had improved. The ALJ determined that Plaintiff's concentration was limited but satisfactory to perform work activity. The ALJ translated Dr. Gauch's findings that Plaintiff's ability to understand and remember very short and simple instructions and to maintain concentration and attention was fair to a limitation to simple work as defined by the regulations.

The ALJ also considered the opinions of the agency physicians. (AR 29-30.) On May 6, 2013, Dr. Janssen found that Plaintiff was not significantly limited in her ability to carry out very short and simple instructions; to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; to work in coordination with or in close proximity to others without being distracted by them; and to make simple work related decisions. Plaintiff was moderately limited in her ability to carry out detailed instructions; to maintain concentration and attention for extended periods of time; sustain an ordinary routine without special supervision; and compete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (AR 202.) Dr. Janssen found that there had been no material change in Plaintiff's psychological condition from her prior application and she retained the ability to perform unskilled labor. (AR 203.)

On December 28, 2013, Dr. Kresser reviewed the case on reconsideration and found that

while Plaintiff alleged a worsening of her mental condition, there was no worsening of her mental condition since the mental consultative examination. (AR 220.) However, Dr. Kresser did find a significant change in social functioning that required more limitations in social interaction. (AR 220.) Dr. Kresser affirmed Dr. Janssen's opinion. (AR 225-226.)

The ALJ found that contrary to Dr. Janssen and Kresser's opinions, Plaintiff's mental impairments have increased despite ongoing treatment and she would be limited to simple work with occasional changes in the work setting, occasional interaction with others, and supervision at least four times during the workday. (AR 30.) While the contrary opinion of a non-examining expert is not sufficient by itself to constitute a specific, legitimate reason for rejecting a treating or examining physician's opinion, however, "it may constitute substantial evidence when it is consistent with other independent evidence in the record." Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001). Here, the Court notes that Plaintiff has not pointed to any conflicting opinions finding that Plaintiff does not retain the concentration, persistence, and pace to perform work activities.

Although Plaintiff offers a different interpretation of the evidence, it is not this Court's function to second guess the ALJ's conclusions and substitute the court's judgment for the ALJ's. Burch, 400 F.3d at 679. The ALJ did consider Plaintiff's limitations in concentration and attention and incorporated such limitations into the RFC by limiting Plaintiff to simple work, defined in the DOT as SVP levels 1 and 2, routine and repetitive tasks and the requirement that she have close supervision while working, defined as checking on the individual four times throughout the workday. The ALJ's finding is supported by substantial evidence in the record.

The hypothetical proffered to the VE during the April 23, 2015 hearing was an individual of Plaintiff's age, education and work experience who is limited to simple work, defined in the DOT as SVP levels 1 and 2, routine and repetitive tasks, involving only occasional changes in the work setting, occasional interaction with the general public, coworkers, and supervisors who requires close supervision such that a supervisor would need to check on them four times throughout the day. (AR 75-76, 78.) The hypothetical presented to the VE is consistent with the RFC and the ALJ found that this individual would be able to perform work available in the

national economy and in the state.  (AR 76, 78.)

The ALJ did not fail to include Plaintiff's limitations regarding concentration and attention in the hypothetical presented to the VE at the April 23, 2015 hearing.

**V.**

**CONCLUSION AND ORDER**

Based on the foregoing, the Court finds that the ALJ did not err in the credibility determination and the hypothetical presented to the ALJ included Plaintiff's limitations in concentration and attention.

Accordingly, IT IS HEREBY ORDERED that Plaintiff's appeal from the decision of the Commissioner of Social Security is DENIED.  It is FURTHER ORDERED that judgment be entered in favor of Defendant Commissioner of Social Security and against Plaintiff Jessica Ann Caldeira.  The Clerk of the Court is directed to CLOSE this action.

IT IS SO ORDERED.

Dated:   **November 8, 2017**   

UNITED STATES MAGISTRATE JUDGE